In the Matter of TRANSPORT CLEAR-
INGS-MIDWEST, INC., Debtor.

LAWRENCE FREIGHT LINES,
INC., Plaintiff,

v.

TRANSPORT CLEARINGS-MIDWEST,
INC., Defendant.

Bankruptcy No. 78–01179–B–W–4.

United States Bankruptcy Court,
W. D. Missouri, W. D.

Oct. 9, 1979.

D. S. Hults, Lawrence, Kan., for plaintiff.

James C. Mordy, Kansas City, Mo., for defendant.

AMENDED FINDINGS OF FACT, CONCLUSIONS OF LAW, DECREE OF NONDISCHARGEABILITY OF DEFENDANT'S INDEBTEDNESS TO PLAINTIFF AND JUDGMENT FOR PLAINTIFF AND AGAINST DEFENDANT IN THE SUM OF $1,135.47

DENNIS J. STEWART, Bankruptcy Judge.

The action at bar was brought by the plaintiff, a resigned member of the defendant debtor clearinghouse, through which the plaintiff, a carrier who transported goods and merchandise for certain shippers, sought collection of its charges from the shippers. Plaintiff, by the precise terms of its complaint herein, requests a decree of nondischargeability pursuant to section 17 of the Bankruptcy Act and also seeks what the defendant interprets to be reclamation.[1]

The action has been submitted to the court on a stipulation of facts of which the following is the substance:

"1. Lawrence was formerly a member of TC-Midwest. Lawrence resigned its membership in TC-Midwest, effective July 14, 1978.

"2. Lawrence did not sell or assign any of its freight bills to TC-Midwest after July 14, 1978.

"3. After July 14, 1978, a number of Lawrence's shippers sent checks to TC-Midwest, Inc. in payment of Lawrence

---

1. The decree of nondischargeability, according to the letter of the complaint, is sought under the provisions of "Section 17(c)(2)" of the Bankruptcy Act, which generally provides that the bankruptcy court has exclusive jurisdiction to make such decrees with respect to grounds for nondischargeability which are provided in sections 17(a)(2), (4), and (8). The material facts alleged in the complaint, however, are sufficient to allege a case of wilful and malicious conversion under section 17(a)(2), by virtue of alleging that the defendant "received funds belonging to the ... Lawrence Freight Line and has ... refused to pay the same to the complainant." See the principles adverted to in paragraph (4) on page 896 of the text of this memorandum, *infra*.

freight bills which Lawrence had not sold or assigned to TC-Midwest. Attached as Exhibit A hereto is a list of such payments, together with the number and amount of each such freight bill, the name of the shipper and the date that TC-Midwest received payment of such freight bill from the shipper.

"4. TC-Midwest received $2,652.66 of such payments prior to filing of this proceeding on September 21, 1978, and received $554.91 of such payments on or after September 21, 1978, as set forth in the attached Exhibit A. TC-Midwest is obligated to pay to Lawrence the total amount of $3,207.57.

"5. From July 11, 1978, through April 10, 1979, TC-Midwest has made a number of chargebacks to Lawrence, with respect to freight bills which Lawrence sold and assigned to TC-Midwest prior to July 14, 1978. A list of such chargebacks is attached as Exhibit B hereto. Lawrence has accepted and agreed to each of these chargebacks, and the total amount of $978.48 is now due and owing from Lawrence to TC-Midwest."

Further, it is stipulated that between the dates of July 14, 1978, and September 21, 1978, the date of the filing of the Chapter XI petition herein, some $2,652.66 was paid by certain shippers to the debtor on account of bills owed to the plaintiff. After that date, some $554.91 was paid to the debtor, erroneously, by shippers. And it is further stipulated that the plaintiff owes the debtor some $978.48 in "chargebacks", i.e., on account of prior overpayments or erroneous payments by the debtor to the plaintiff. After October 2, 1978, the date that the court entered its order placing the debtor in possession, some $13.15 was erroneously collected.

Finally, the files and records in this case show that, among the personal property scheduled as assets in Schedule B-2 of the debtor's petition was some $17,106,807.74 in "unapplied cash", explained as follows:

"At September 30, 1978, Unapplied Cash amounted to $17,106,807.74. Unapplied Cash is cash received, but for vari-

ous reasons cannot be matched against specific charges in the mechanized accounts receivable system to cancel the amount. The most common causes of Unapplied Cash are:

"1. Insufficient receiving data to properly match against open charges.

"2. Duplicate payments on charges already cleared from the file.

"3. Payments to the Clearing House by customers which should have been paid direct to the Carrier.

"Payments received concerning items 2 and 3 above actually represent liabilities, amounts which should be refunded. However, at this time the payees and amounts are not determinable. The 'maintenance' of the accounts receivable system is presently in progress, but it is a very time consuming process. Currently, the estimate of time for substantially completing the 'maintenance' is approximately December 31, 1978.

"Unapplied Cash is recorded as a reduction of the accounts receivable total."

It is the plaintiff's argument, based on the stipulated and otherwise established facts, that the monies mistakenly paid by shippers to the debtor, when they should have been paid directly to the plaintiff, constitute "[m]oney paid to the bankrupt prior to bankruptcy under a mistake of fact" which "is impressed with a constructive trust that follows it into the hands of the bankruptcy trustee." 4A Collier on Bankruptcy ¶ 70.25, p. 346 (1978); *In re Berry*, 147 F. 208 (2d Cir. 1906). Accordingly, in addition to a decree of nondischargeability, the plaintiff requests that:

" . . . said funds be set aside to the credit of Lawrence Freight Line, Inc., in accordance with the provisions of § 17c(2) [and] (4) of the Bankruptcy Act and that the Trustee be ordered and directed to remit said funds to Lawrence Freight Line, Inc., and further instructed not to co-mingle said funds with other assets of the debtor."

The debtor rejoins, however, that "[i]n order to have a constructive trust established, it is an essential requirement that there must be a fund or *res* " and that:

"It is not enough ... to show merely that the funds or property came into the bankrupt's hands or went into the bankrupt's business or, by the better view, even that the funds or property are contained somewhere in the bankrupt's estate. If the trust fund cannot be identified in its original or substituted form, the *cestui* becomes merely a general creditor of the estate, for the prevailing rule in trusts is that 'a beneficiary who cannot find the trust property has no lien or charge spread over the entire estate of the faithless trustee.' The same result will accrue where the trust property has been disposed of or dissipated in such manner as to leave nothing in its place." 4A Collier on Bankruptcy ¶ 70.25, p. 355 (1978).

This argument is sought to be rebutted by the plaintiff's assertion that, in its petition and schedules herein, the debtor listed some $18,000,000 in "unapplied cash" as among its assets. And surrebuttal comes in the form of an argument by the debtor that "[t]his so-called Unapplied Cash ... did not constitute a fund of cash held by the Debtor, but 'actually represents liabilities,' as explained in said Schedule B."

It thereby appears that the debtor does not deny the liability (for which, it contends, the court should "allow plaintiff to file a claim in this case as a general unsecured creditor of the debtor for said amount of $3,194.42."), but challenges the right to its reclamation and the right to a decree of nondischargeability on account of it.

■■ The right to immediate reclamation is not an issue which leads to the mountain of difficulty which exists in this case. In that respect, the debtor's claims and contentions are manifestly well found-ed. To recover the property *in specie*, as a matter of simple reclamation, it is rudimentary that money must be traced into a specific fund or its substitute. Otherwise, the simple relationship established between one whose property is, in effect, converted by the bankrupt, or any other party,[2] is that of creditor and debtor.

To remit a creditor offended in this manner to his general unsecured nonpriority claim against the debtor's or bankrupt's estate, which ordinarily may be expected to be paid only *pro rata*, is an obvious injustice when the converter knew or should have known that the property converted belonged to the creditor. Such a result offends the cardinal principle of equity that a person should not be allowed to benefit by his own wrong.[3]

The almost-insurmountable obstacle of tracing money and other fungibles into a debtor's or bankrupt's estate was formerly alleviated by the beneficial doctrine that the creditor, even if he could not trace the property of which he had been deprived, could, without the necessity of tracing, obtain a decree of nondischargeability against the corporation or corporate officer responsible for the conversion, or both.[4] Thus, while the money or property might not be returnable *in specie* to the creditor, the liability would not be cut off by the discharge in bankruptcy.

■ But that was prior to the decision in *In re Whitlock*, 449 F.Supp. 1383 (W.D.Mo. 1978), which apparently now makes tracing a necessary prerequisite to the decree of nondischargeability just as it is to the reclamation of the property or money. For, in that case, the court held that, in order for

---

2. It is the contention of the debtor-in-possession that the only parties in interest are the shippers who have erroneously paid the money to Transport Clearings-Midwest rather than to the plaintiff. But there is no question that an assignee of property or money is a proper party plaintiff, although he may later have to account for his recovery to an assignor or other parties. See *Staggers v. Otto Gerdau Co.*, 359 F.2d 292 (2d Cir. 1966).

3. It also confuses, as do *In re Whitlock*, 449 F.Supp. 1383 (W.D.Mo.1978), and *Kelley v. Conwed Corp.*, 429 F.Supp. 969 (E.D.Va.1977), the remedy of reclamation with those remedies which are available to a creditor under section 17 of the Bankruptcy Act.

4. See note 3, *supra*. Cf. principles set out at p. 896 of the text of this memorandum, *infra*.

the corporate officer responsible for the conversion of the property or specific money to be subjected to the nondischargeability decree, it must be shown that he personally benefited or gained from the conversion.[5] Conversely, neither should the corporation[6] suffer a nondischargeability decree if the corporate officer has solely benefited from the conversion.[7]

Viewing the complaint of the plaintiff in the action at bar under the *Whitlock* rule would result in the total denial of the plaintiff's complaint and the granting, in total, of all of defendant's claims and defenses, including a counterclaim against plaintiff, without the allowance of any setoff, in the sum of $978.48.[8] For the mere identification of liabilities which exist because of unapplied cash (the fund of which has long since been converted) hardly suffices to trace plaintiff's money into a fund which the debtor has maintained.[9]

The injustice is all too obvious. The debtor profits by the simple expedient of failing or refusing to return money which does not belong to him. The creditor is frustrated by a rule which thoughtlessly and erroneously imposes the duty of tracing when the question is not reclamation, but liability generally.[10]

The principle that a person should not profit by his own wrong is of such paramount force in this case that it would not be conscionable to follow the rule of *In re Whitlock, supra*, even though it may appear to have direct and apposite application to the action *sub judice*. For, as the imposition of its rule to this case graphically demonstrates, the result can only be injustice and a form of harsh forfeiture which equity abhors, and therefore cannot allow, even if the law so provides.[11]

Further, the *Whitlock* decision, *supra*, as it is applicable to this case, may well be contrary to four well-established and basic principles of state and federal substantive and procedural law, which must necessarily have application here.[12] Thus, seemingly contrary to the prior and governing law, the court, in *Whitlock, supra*, promulgated the following doctrines:

(1) A corporate officer's unauthorized use of a corporate creditor's specific property

---

**5.** "Without the presence of evidence showing that the bankrupt-officer obtained some illegitimate benefit from his position, the debts remained those of the corporation." 449 F.Supp. at 1388.

**6.** Ordinarily, for conversion, a corporation is jointly and severally liable with the corporate officer or officers through whom it acted. See principles and authorities set out at pp. 895–896 of the text of this memorandum, *infra*. Cf. note 7, *infra*.

**7.** In the *Whitlock* and *Kelley* cases, see note 3, *supra*, this follows from the fallacious premise that tracing is the fundamental prerequisite to a decree as it is to a reclamation order.

**8.** According to the stipulation between the parties, see note 2 of the text of this memorandum, *supra*, that sum is due and owing to defendant from the plaintiff.

**9.** At the same time, the refusal to maintain and set aside a fund when the debtor knew or should have known that the monies were paid to it only by mistake constitutes nondischargeable conversion within the meaning of section 17(a)(2) of the current Bankruptcy Act.

**10.** See notes 3 and 7, *supra*.

**11.** Further, "(e)quity will not afford its aid to one who by his conduct or neglect has put the other party in a situation in which it would be inequitable to place him." 30 C.J.S. Equity sec. 95, p. 1020, n. 26. And it would be inequitable now to exact the chargebacks from the plaintiff without allowing his setoffs against the defendant.

**12.** It is by the law of the state that the existence and nature of the debts owed by the bankrupt as of the date of bankruptcy must be determined. "What claims of creditors are valid and subsisting obligations against the bankrupt at the time a petition in bankruptcy is filed is a question which, in the absence of overruling federal law, is to be determined by reference to state law." *Vanston Bondholders Protect. Com. v. Green*, 329 U.S. 156, 161, 67 S.Ct. 237, 239, 91 L.Ed. 162 (1946). It follows that the determination of dischargeability *vel non* must ordinarily be made in terms of the governing state law.

by pledging it to secure a loan to the corporation is not conversion.[13]

(2) The liability created by an conversion of a corporate creditor's specific property is only that of the person—whether corporation or corporate officer—who benefits or gains from it.[14]

(3) It does not constitute a personal benefit or gain to apply converted property as security or payment for a debt which would otherwise have to be paid with one's own money.[15]

(4) Even if facts are established on the basis of unobjected-to evidence in a controversy between parties which clearly warrant judgment on a legal theory other than one specifically pleaded by that party, that judgment may not be granted.[16]

▆ In respect of each of these propositions, it would seem that much, if not all, of previously-known state and federal authority may be to the contrary, as is indicated by the following citations, to isolate only a few of the many available:

(1) It is "misappropriation" for corporate officers of an insolvent corporation to "apply the proceeds of sales of property . . . owing to appellee to other claims . . . ." *John P. Maguire & Co. v. Herzog*, 421 F.2d 419, 422 (5th Cir. 1970). It is conversion not to pay over moneys collected by a corporation on behalf of a manufacturer. *Darling & Co. v. Fry*, 24 S.W.2d 722 (Mo.1930). One who sells secured property and turns proceeds over to a party other than the secured party "renders himself liable to the secured party for a conversion, even though he acted in good faith and had no knowledge, actual or constructive, of the secured party's interest in the property." *Commercial Cr. Corp. v. Joplin Automobile Auction Co.*, 430 S.W.2d 440, 444 (Mo. 1968). "By the great weight of authority it is recognized that officers of a corporation are personally liable, or are jointly liable with the corporation, to one whose money or property has been misappropriated or converted by them to the uses of

---

**13.** "Without the presence of evidence showing that the bankrupt-officer obtained some illegitimate benefit from his position, the debts remain those of the corporation. Since they are corporate debts, they cannot be asserted in Whitlock's personal bankruptcy." 449 F.Supp. at 1388.

**14.** See note 13, *supra*. It seems necessarily to follow that the corporation should not be made to pay for money diverted to the personal benefit of the corporate officer, according to the logic of this general reasoning.

**15.** In this respect, the district court first reasoned that there really could be no conversion when the "chattel paper" involved in *Whitlock* was pledged to secure a loan for the corporation which the corporate officer personally guaranteed for the reason that "if the loan proceeds from the pledge had been properly applied, there would be no dispute," 449 F.Supp. at 1387, n. 9. Second, it reasoned that the authority of *John P. Maguire & Co. v. Herzog*, 421 F.2d 419 (5th Cir. 1970), to the effect that use of proceeds collected on chattels to pay a loan on which the corporate officer was "secondarily liable" constituted "personal benefit" was inapplicable to the *Whitlock* case.

The first reason thus given was assigned in apparent disregard of the fact that none of the loan proceeds were ever paid to the plaintiffs in the *Whitlock* case. And the only reasoning or authority given for the second reason is that

the pledge of chattel paper to cover a loan on which the corporate officer had subscribed a guarantee "is very different from using the loan proceeds to pay creditors to whom he was secondarily liable." It is difficult to determine, however, how the former can be different from the latter in terms of "personal gain or benefit," assuming that that is necessary to show the conversion by a corporate officer (as it is not under all the case law except that set forth by the *Whitlock* decision). Further, by definition, a guarantee is a form of "secondary liability." See, e.g., Black's Law Dictionary, pp. 833, 1519 (1968).

**16.** "It is true that in *Kelley* the transferred corporate assets were not the specific property of the complaining creditor. In this case, the chattel paper pledged to Park Bank was still the creditors' property at the time of the pledge. However, neither (plaintiff) ha(s) ever contended that Whitlock's conduct constituted a 'willful and malicious conversion of the property of another.' Their position has always been that Whitlock's conduct amounted to 'misappropriation or defalcation while acting as an officer.' " 449 F.Supp. at 1389. But see 1A Collier on Bankruptcy para. 17.24, p. 1703 (1978) at note 6, basically equating "willful and malicious conversion" under Section 17(a)(2) and "misappropriation" under Section 17(a)(4) of the Bankruptcy Act.

the corporation, although they derived no personal benefit therefrom and acted merely as agents of the corporation—the theory being that an agent cannot escape the consequences of his tort by the fact that he committed the tort as agent for his principal." Anno., Personal Liability of Corporate Directors or Officers to Third Persons for Restitution, or for Damages for Conversion, Under Circumstances Rendering the Corporation Itself Liable, 152 A.L.R. 696, 705 (1944).

(2) See Anno., 152 A.L.R. 696, 705, cited *supra.* "Of course, defendant's liability did not depend upon his having derived any personal benefit from the alleged conversion." *Darling & Co. v. Fry, supra,* at 724. A corporate officer was held liable for conversion of the plaintiff's money to pay other corporate debts for which the officer bore no personal liability in *Patrons Bank & Trust Co. v. Shapiro,* 215 Kan. 856, 528 P.2d 1198 (1974). "The debt . . . would seem to have been created by his appropriation or defalcations while acting as an officer of the bankrupt corporation . . . whether or not he profited personally by the transaction." *Kaufman v. Lederfine,* 49 F.Supp. 144, 145 (S.D.N.Y.1943).

(3) "[A]ppellant was partially motivated by a desire to indemnify himself against loss when he applied proceeds owing to appellee to other claims on which he was secondarily liable." *John P. Maguire & Co. v. Herzog, supra,* at 422.[17]

(4) "[W]hen evidence relating to issues outside the pleadings is introduced and tried without objection, the parties will be deemed to have acquiesced." *Nielson v. Armstrong Rubber Co.,* 570 F.2d 272, 275 (8th Cir. 1978). "The Federal Rules of Civil Procedure demand a liberal con-

struction of pleadings, requiring only that they give fair notice of what the evidence is expected to show . . . Rule 15(b) does not lose its vitality because, in addition to the facts introduced without objection, the pleader failed to include a tag giving such facts their legal significance." *Wansor v. George Hantscho Co., Inc.,* 570 F.2d 1202, 1208 (5th Cir. 1978).

These latter propositions are applicable to the action at bar, in which there is no explicit stipulation of benefit to the corporation nor even any explicit claim of conversion, but, when it is agreed that monies belonging to plaintiff once were in the possession of the defendant but no longer are, the facts stipulated by the parties conclusively show that the plaintiff is entitled to a decree of nondischargeability for "wilful and malicious conversion" by the debtor—as opposed to the debtor-in-possession [18] —within the meaning of § 17(a)(2) of the current Bankruptcy Act, especially when it is reasonably inferable that the money went to satisfy obligations which the corporation would otherwise have had to pay. For it is shown that, prior to the date of the commencement of these Chapter XI proceedings, the debtor knew or should have known [19] that certain monies which it had on hand belonged to [20] the plaintiff, but rather than return these monies, it used them for a purpose which is not disclosed by the stipulation. The parties to this action have not stipulated to wilfulness and malice on the part of the debtor, but these are terms of art. The current Act does not require that the debtor or bankrupt be guilty of actual wilfulness or malice in order to give rise to a nondischargeable liability. Rather, it is sufficient to show the

---

17. Cf. note 15, *supra.*

18. Nearly all the monies here sought—except $13.15 in respect to which the debtor-in-possession is willing to confess judgment—are chargeable solely to the debtor by reason of the fact that the order of this court placing the debtor in possession and authorizing it to continue business was not entered until October 2, 1978.

19. There is absolutely no explanation in the stipulation between the parties for the retention of monies admittedly paid by mistake to the debtor which would warrant any other finding than that the debtor should have known of the plaintiff's right to the monies. And cf. notes 22 and 23, *infra.*

20. See note 2, *supra.*

intentional disregard of a known right.[21] And reckless disregard is sufficient to evidence intention.[22] It is therefore sufficient to show that the debtor "should have known" that the money was the property of the plaintiff.[23] The debtor cannot be allowed to profit from a system of matching payments to bills which was insufficient timely to identify the mistaken payment here *sub judice*. And it is immaterial under the governing law which imposes joint and several liability upon both a corporation and the responsible corporate officer for conversion whether the money went for corporate or individual purposes.[24]

For the foregoing reasons, it is concluded that the debtor's liability to plaintiff should be regarded as nondischargeable in bankruptcy.

 .In addition to a decree of nondischargeability, the plaintiff requests that the court, in effect, issue a mandatory injunction against further conversion or misapplication of unapplied cash. But, as noted above, the debtor-in-possession has continued to make assiduous progress in reducing the amounts of unapplied cash in the face of an accounting system which it inherited from the debtor and which was characterized by an inability to match payments rapidly with the outstanding bills.[25] It would therefore be difficult to make a finding with respect to the debtor-in-possession that any technical conversion was wilful and malicious within the meaning of section 17(a)(2).[26] Even so, the court cannot issue a nondischargeability decree based upon prospective, anticipated acts of conversion.[27] And any other relief *in futuro* is pre-empted by the confirmed plan of arrangement which proposes to make repayment of erroneous payments to the proper carriers at the earliest possible time.[28] The stipulation

---

21. If the act of conversion is done deliberately and intentionally in knowing disregard of rights of another, it falls within the exclusionary language of § 17(a)(2) even in the absence of actual malice. *Bennett v. W. T. Grant Co.*, 481 F.2d 664 (4th Cir. 1973).

22. In respect to the dischargeability statute generally, reckless disregard is usually regarded as the legal equivalent of intent. See *In re Houtman*, 568 F.2d 651, 655–656 (9th Cir. 1978), and cases there cited. In cases involving the conversion of property by a corporation finding it necessary to do so because of a wasting of assets, the element of willfulness and maliciousness has been found to exist. *Matter of Amador*, 596 F.2d 428 (10th Cir. 1979).

23. See note 22, *supra*.

24. Some authorities say that the dual liability is based upon the doctrine of vicarious or secondary liability. See, e.g., *Donsco, Inc. v. Casper Corp.*, 587 F.2d 602, 606 (3d Cir. 1978 ("A corporate officer is individually liable for the torts he personally commits and cannot shield himself behind the corporation when he is an actual participant in the tort . . . The fact that an officer is acting for a corporation also may make the corporation vicariously or secondarily liable under the doctrine of respondeat superior."). Other cases simply speak in terms of the joint liability of joint tortfeasors. See Anno., 152 A.L.R. 696, 705 (1944).

25. See p. 892 of the text.

26. Rather than knowingly disregarding these rights, the debtor-in-possession is trying to safeguard them, *inter alia*, by providing for their payment under the plan of arrangement. See note 28, *infra*.

27. Nor even acts which take place after the date of bankruptcy or the date of the petition for Chapter XI relief.

28. Shippers who have been injured by erroneous payments to the debtor are included in the following class of creditors under debtor's plan:

"*Class 1.* All costs and expenses of administration which have priority under Section 64(a)(1) of the Bankruptcy Act, including, but not limited to, amounts due to shippers, carriers and other parties resulting from overpayments, duplicate payments, receipt of payments on freight bills not belonging to the Debtor or Debtor-in-Possession, and other transactions which have occurred after the filing of the bankruptcy petition herein on September 21, 1978, subject to the right of the Debtor to set off any amounts due to it from the obligee, payment of said amounts arising from said post-petition transactions of the nature herein specified to be deferred until sufficient cash has been generated to pay all such items but such payment to occur before payment of any Class 4 claims."

The debtor's plan provides for payment to creditors in Class 1 as follows:

"All of the costs and expenses of administration which have priority under Section 64(a)(1) of the Bankruptcy Act, as determined and allowed by the Court, less any

of the parties does not make possible any finding of bad faith in this regard which may be enjoinable.

## II

After the preparation of the above and foregoing findings and conclusions, the parties stipulated that the amount of the judgment in this action should be reduced to $1,135.47.

It is therefore, for the foregoing reasons

ORDERED, ADJUDGED AND DECREED that the indebtedness of defendant to plaintiff in the sum of $1,135.47 be, and it is hereby, declared to be nondischargeable in bankruptcy. It is further, accordingly, under section 17(c)(3) of the Bankruptcy Act,

ADJUDGED that plaintiff have and recover the sum of $2,229.09 from the defendant.

amounts owed to the Debtor or to the Debtor-in-Possession which the Debtor or the Debtor-in-Possession would have the right to set off against any such costs and expenses of administration, shall be paid in full in cash upon Confirmation, or as otherwise provided in the Bankruptcy Act or the Bankruptcy Rules, and such costs and expenses of administration shall not be affected by this Plan."