In the Matter of David F. WHEELER, Debtor.

MERCURY MARINE ACCEPTANCE CORP., Plaintiff

v.

David F. WHEELER, Defendant.

Bankruptcy No. 86–02303–3.
Adv. No. 86–0417–3.

United States Bankruptcy Court,
W.D. Missouri, W.D.

Jan. 20, 1987.

Bruce E. Strauss, Merrick, Baker, Fox & Haufft, Kansas City, Mo., for plaintiff.

Stephen B. Strayer, Kansas City, Mo., for defendant.

MEMORANDUM OF FINDINGS OF FACT, CONCLUSIONS OF LAW SUPPORTING FINAL DECREE DECLARING DEFENDANT'S INDEBTEDNESS TO PLAINTIFF IN THE SUM OF $14,574.00 TO BE NONDISCHARGEABLE IN BANKRUPTCY AND FINAL JUDGMENT THAT PLAINTIFF HAVE AND RECOVER THE SAME SUM FROM DEFENDANT

DENNIS J. STEWART, Chief Judge.

Plaintiff alleges that an indebtedness owed to it by defendant, on account of the former's security interest in a boat and trailer, which was repossessed by defendant's corporation from an original buyer and resold without any observation of plaintiff's security interest, is nondischargeable in bankruptcy under § 523(a)(6) ("willful and malicious" injury to property) and § 523(a)(4) (embezzlement or defalcation by a fiduciary) of the Bankruptcy Code. The action came on before the Court for hearing of its merits on January 6 and 12, 1987, whereupon plaintiff appeared by counsel, Bruce E. Strauss, Esquire, and the defendant appeared personally and also by counsel, Stephen B. Strayer, Esquire. The evidence which was then addressed demonstrated the following material facts: The defendant's corporation, Wheeler Marine, Inc. sold the boat (Serial Number XDXE0092C585) and trailer (Serial Number 1MDG1DN83FD–239673) in question to Daniel D. O'Dell and Carrie L. O'Dell on June 11, 1985. The buyers executed a retail installment contract which set out the

purchase price ($11,690.00 for the boat and $710.00 for the trailer) and which provided for the sale of the contract "with recourse" to a financing institution such as the plaintiff. An arrangement was made by and between the O'Dells—Daniel D. O'Dell was an employee of the corporation of which the debtor was president—whereby debtor would make O'Dell's payments for him. The debtor, however, states that he did not make any payments on account of the indebtedness of O'Dell to the plaintiff.

The contract was then sold to the plaintiff Chrysler Credit Corporation. At the time of that sale, application had been made for a certificate of title which recognized the security interest in the boat and trailer of the plaintiff Chrysler Credit Corporation. The evidence does not clearly explain whether the O'Dells then took the boat and used it as their own or whether it remained on the premises of the debtor's corporation. It is equally unknown whether remodeling work on the boat commenced as of the time of the O'Dell purchase or whether the O'Dells initially intended to keep it and use it as their own throughout the duration of its useful life. The evidence without any equivocation shows that the sale of the subject boat and trailer by the debtor's corporation to its above-mentioned employee was subject to the plaintiff's security interest. The attendant papers also disclose the sale to have been made with the intention of recognizing the plaintiff's putative security interest in the boat and trailer. The application for certificate of title contains a notation of the plaintiff's name as the lienholder. And, when the debtor's corporation sold the account to plaintiff, the sale took place "with recourse" so that the debtor's corporation would be liable for such payments as were not made by the purchaser.

There was evidence, also, which supported the intention of the debtor to pay for the boat and trailer. Such payments as were made, were made by him personally, according to the evidence.

During the period of time when the boat and trailer was nominally owned by the debtor corporation's employee, according to the transaction above described, it was apparently undergoing a metamorphosis and overhaul in preparation for resale. At length, a prospective purchaser, Michael Leaps, a boat aficionado of some experience, contracted to purchase a boat from the debtor corporation, which would be made and fitted to his specifications. In making this contract, it was Mr. Leaps' testimony in the hearing of this action, that he dealt with officers or employees of the debtor's corporation other than the debtor. In his testimony he stated that "they" told him that a new boat was being specially remodeled according to his requested specifications but that he would not be permitted to observe the work in progress because, as a sailor, it would be distressing for him to see the hull of the boat being torn down so that it might be rebuilt according to his desires. In his answers to questions which were posed by the Court, Mr. Leaps identified "they" were a salesman of the debtor's corporation by the name of McNeil and a distributor in Iowa by the name of "Ralph." It was "they" who, according to Mr. Leaps led him to believe that he was buying a new trailer—a misrepresentation which was revealed when, in response to Mr. Leaps' application for certificate of title, the State of Missouri Department of Revenue requested the payment of certain taxes which had been incurred by the prior purchaser, the above-mentioned employee of the debtor's corporation. The papers which were filled out to memorialize the purchase of the boat and trailer by Mr. Leaps show unequivocally that the boat and trailer being bought by him were the same boat and trailer which the debtor corporation had earlier, as detailed above, sold to O'Dell, its corporate employee. The serial numbers of the boat and trailer contained in the papers recording the Leaps purchase were the same as the serial numbers contained in the papers memorializing the O'Dell sale. Those papers further show that it was the intention of the purchaser that plaintiff's lien not continue to be recognized with respect to the boat and trailer, for plaintiff's name was not listed as the name of the lienholder on Mr. Leaps' application for certificate of

title. The uncontradicted testimony of Mr. Leaps is to the further effect that he had not, as of the date of the hearing, yet received his certificate of title and that that document remained in possession of "the bank."

Plaintiff has brought suit for the full balance due it as of the time of filing of the within bankruptcy proceeding, the sum of $16,012.26 according to the uncontradicted evidence. The documentary evidence shows that the sale price of the boat and trailer was approximately $13,000.00 when it was sold to O'Dell and slightly less than that when sold to Leaps. But the plaintiff contended that it should have been known by Mr. Leaps, in making the second purchase, that the boat and trailer were not new and had been owned by a previous purchaser from the debtor's corporation.

In his testimony in the hearing of this action, the debtor acknowledged that he was the president of the corporation at all pertinent times in question; that he was aware of the first sale of the boat and trailer to the employee O'Dell; that he told O'Dell that he would take care of the payments (but did not do so), that he was also aware of the second sale of the boat to Mr. Leaps, and that, in fact, he informed the plaintiff's employee—whom he identified as "Rizzo"—of the second sale. Plaintiff produced the testimony of Steve Risko, its employee, who stated that his name was commonly mistaken as "Rizzo" but whose memoranda did not reflect that the debtor had notified the plaintiff of the second sale of the boat and trailer and Mr. Risko did not have any personal recall of it.

### Conclusions of Law

 The above-found facts clearly compel a finding that the second sale of the boat and trailer in derogation of the plaintiff's security interest in them was a conversion. It was an exercise of dominion over the plaintiff's property, within the meaning of the authorities defining conversion, in derogation of the plaintiff's claim of title in the property.[1] In the posthearing arguments of counsel, the defendant did not deny that a conversion had taken place, but rather denied his responsibility for it, contending that this is "a matter between two corporations." It is true that the law does not make a corporate officer liable for a conversion which benefits his corporation.[2] But, if the corporate officer participates in the conversion, he becomes jointly and severally liable, together with his corporation, for the value of the property converted. See e.g. Annot., Personal Liability of Corporate Directors or Officers to Third Persons for Restitution, for Damages for Conversion, Under Circumstances Rendering the Corporation Itself Liable, 152 A.L.R. 696, 705 (1944).[3] The evidence leaves little doubt that the defendant participated in the conversion. He knew of and approved of the efforts of his employees to sell the boat and trailer a second time in a manner which could not recognize plaintiff's security interest because it purported to the second purchaser to be a first sale. He was sufficiently involved in the conversion to the extent that, by his own admission, he notified plaintiff's employee of the second sale. And there was no evidence that he requested plaintiff's consent to the sale, but only defendant's own statement that he notified a "Mr. Rizzo" of

1. "Conversion may be proved ... by any use or appropriation to the use of the person in possession, indicating a claim of right in opposition to the rights of the owner." *Arnold v. Prange,* 541 S.W.2d 27, 30 (Mo.App.1976) and cases there cited.

2. "A director or officer of a corporation does not incur personal liability for its torts merely by reason of his official character, he is not liable for torts committed by or for the corporation unless he has participated in the wrong." 18B Am.Jur.2d *Corporations* § 1877, pp. 723–724 (2d ed. 1985).

3. And see 18B Am.Jur.2d *Corporations* § 1877, pp. 724 (2d ed. 1985), to the following effect: "if, however, a director or officer commits or participates in the commission of a tort, whether or not it is also by or for the corporation, he is liable to third persons injured thereby, and it does not matter what liability attaches to the corporation for the torts. A contrary rule would enable a director or officer of a corporation to perpetrate flagrant injuries and escape liability behind the shield of his representative character, even though the corporation might be insolvent or irresponsible."

the second sale. These facts provide a sufficient basis for concluding that defendant participated in the conversion.

The Court is aware that some decisions have held that corporate officers are not—absent some "special benefit" to themselves—liable for conversions made in favor of the corporation. Without the presence of evidence showing that the bankrupt officer obtained some illegitimate benefit from his position, the debts remain those of the corporation. *In re Whitlock*, 449 F.Supp. 1383 (W.D.Mo.1978). See also *In re Long*, 774 F.2d 875, 878 (8th Cir.1985), to the following effect:

> "Draining a corporation's assets for the *personal benefit of an officer* may create a bar to discharge." (Emphasis added.)

But these decisions must be reserved for cases in which there is no evidence of the corporate officer's participation in the conversion. For, otherwise, the law is universally to the contrary and to the effect that either participating in the conversion or deriving a benefit from it can provide a basis for liability for conversion. See e.g. *Matter of Transport Clearings–Midwest*, 16 B.R. 890 (Bkrtcy.W.D.Mo.1979), and cases and authorities therein cited. This Court therefore concludes that the defendant's participation in the conversion makes him liable therefor, even though he may have derived no special benefit therefrom.

▬ In order for a debtor's conversion to be nondischargeable in Bankruptcy, it must be shown to have been both willful and malicious within the meaning of § 523(a)(6) of the Bankruptcy Code. In view of the evidence which has been adduced in this action, the Court finds it unnecessary to take sides in the controversy which continues to rage between decisions holding that a form of "legal malice" (intentional violation of the known right of another) is sufficient to establish willfulness and malice, See *Bennett v. W.T. Grant Co.*, 481 F.2d 664 (4th Cir.1973); *Matter of Amador*, 596 F.2d 428 (10th Cir. 1979); and cases holding that an "actual, subjective" intent to harm must be shown. *Matter of Bellmer*, Civil Action No. 79–6042–CV–SJ (W.D.Mo.1980); *In re Roberts*, 8 B.R. 291 (W.D.Mo.1981).[4] For the facts of this case are sufficiently egregious to amount to willfulness and malice under either standard. The second sale had to be known by the defendant to be "certain to cause harm" to the plaintiff within the meaning of the standard enunciated by our Court of Appeals in *In re Long, supra.*[5] Defendant argues that plaintiff was sufficiently protected by the fact that the initial security agreement contained a "with recourse" agreement making the corporation directly liable to plaintiff in the event the purchaser failed to pay. But plaintiff was also entitled to its security agreement lest it be deprived of value—as it has been—by the happening of eventuality such as bankruptcy. And this action contains facts which give it the look of a particularly hard

---

**4.** And see the comparatively recent decision in *St. Paul Fire & Marine Ins. Co. v. Vaughn*, 779 F.2d 1003, 1009, 1010 (4th Cir.1985), to the effect that "to require specific malice or some other strict standard of malice for nondischargeability of a debt under the Bankruptcy Code would undermine the purposes of that provision and place a nearly impossible burden on a creditor who wishes to show that a debtor intended to do him harm ... To require such specific malice would restrict § 523(a)(6) to the small set of cases where the debtor was foolhardy enough to make some plainly malevolent utterance expressing *his intent to injure his creditors.*"

**5.** "When transfers in breach of security agreements are in issue, we believe (that) nondischargeability turns on whether the conduct is (1) headstrong and knowing ('willful') and, (2)

targeted at the creditor ('malicious'), at least in the sense that the conduct is certain or almost certain to cause financial harm". *In re Long*, 774 F.2d 875, 881 (8th Cir.1985). " 'Every person is liable in trover who personally or by agent ... commits an act of conversion, or who participates in the conversion by instigating, aiding, or assisting another, or who knowingly benefits by its proceeds in whole or in part.' 89 C.J.S. Trover and Conversion § 77, pp. 575, 576 (1955). See also *Darling & Co. v. Fry*, 24 S.W.2d 722, 724 (Mo.App.1930) (holding that, although it is not necessary that the defendant in a conversion action gain a personal benefit, liability in conversion can be predicated on benefitting from the conversion; *Coleman v. Pioneer Studebaker, Inc.*, 403 S.W.2d 948, 952 (Mo.App.1966)." *Matter of Anderson*, 15 B.R. 346, 350 (Bkrtcy.W. D.Mo.1981).

case of deliberate and calculated conversion—the remodeling of the boat so that it could not readily be discerned as the one initially sold to O'Dell and the failure to give any but the most superficial and cryptic notice to plaintiff of the act of conversion. The Court would be conscience-stricken if it did not conclude the conversion in this case to be willful and malicious within the meaning of § 523(a)(6).

Finally, the Court, in awarding damages, for a willful and malicious conversion cannot award the full balance due to plaintiff. The measure of damages for a conversion is the value of the property at the time and place of conversion. Of this value, the amount for which the chattels were sold to Mr. Leaps is sufficient and uncontradicted evidence of that value.[6] Judgment will therefore be rendered for that amount.

See also, Bkrtcy., 65 B.R. 87.

6. The documentary evidence which is before the Court purports to show that the "taxable price" of the boat was $13,324.00 and the "taxable price" of the trailer was $1,250.00. The total of $14,574.00 is the amount for which judgment should accordingly be rendered.